IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**UNITED STATES of AMERICA**

v.                                                            **CRIMINAL NO. 1:21-cr-00008-TBM-RPM**

**MARTIN STEPHEN BROWN**

**MEMORANDUM OPINION OVERRULING IN PART AND SUSTAINING IN PART DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATIVE REPORT**

On May 25, 2021, Martin Brown pled guilty to possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The government compiled a presentence investigation report on July 13, 2021, to which Brown made several objections. The Court held a sentencing hearing on October 27, 2021, where Brown narrowed his objections to two. First, Brown objects to the proposed two-level enhancement under U.S.S.G. § 3C1.2 based upon his reckless flight from the scene. Second, Brown objects to the proposed four-level enhancement for possessing a firearm in connection with another felony under U.S.S.G. § 2K2.1(b)(6)(B). At the hearing, the Court heard testimony from the government's only witness and continued sentencing to November 16, 2021, because of time constraints that arose and to review the applicable law. Having considered the evidence presented, the text of the sentencing guidelines, and the relevant caselaw, the Court overrules Brown's objection to the enhancement for reckless flight and sustains his objection to the enhancement for possessing a firearm in connection with another felony.

**I. FACTUAL BACKGROUND**

At the sentencing hearing held on October 27, 2021, Sergeant Bradley Auringer, of the Narcotics Division of the Harrison County Sheriff's Office, testified to the following facts. On

November 10, 2020, several members of the sheriff's office were traveling in unmarked vehicles through Martin Brown's neighborhood in the De Lisle community of Mississippi as a "show of force." The reason for this display of force, according to Sergeant Auringer, was some citizen complaints regarding narcotics activities. Further, these complaints related to Martin Brown—a known drug user nicknamed "Capone"—and use of a certain shed. The complaints were insufficient, however, for Sergeant Auringer to obtain a search warrant. Instead, Sergeant Auringer explained that the narcotics officers decided to drive through the area in an effort to "calm everybody down" since the members of the community would easily recognize their unmarked vehicles.

Hurricane Zeta had recently struck the Mississippi Gulf Coast, and debris from the storm still littered St. Stephen's Road in De Lisle. A large truck using a claw to pick up debris blocked Sergeant Auringer's vehicle. After waiting for several minutes, Sergeant Auringer turned on his blue lights in his unmarked vehicle to let the workers know that he was going to drive around them. As Sergeant Auringer drove around the work trucks with his blue lights flashing, he noticed Mason Brown—Martin Brown's nephew who was also known by the sheriff's office—standing under a carport of the home of another member of the Brown family. As soon as Mason Brown saw Sergeant Auringer, he fled on foot. Sergeant Auringer hurriedly drove his vehicle through trees down a long driveway onto the rural property where Mason Brown had been standing, and another unmarked vehicle quickly pulled in next to him. Both unmarked police vehicles had their lights flashing.

While other deputies pursued Mason Brown, Sergeant Auringer noticed a gray Pontiac Vibe pulled up to the shed behind the house—the same shed that was the subject of the narcotics

activity complaints. The shed door was opened, and it appeared to Sergeant Auringer that the driver was planning to load or unload something from it. Sergeant Auringer jumped out of his vehicle and began to identify himself. He then noticed that the Pontiac Vibe's driver was Martin Brown. Sergeant Auringer—who was dressed in plain clothes and a tactical vest with the word "Narcotics" displayed across the front—drew his firearm and shouted, "Police! Police! Stop the car! Police! Stop the car!" Martin Brown made eye contact with Sergeant Auringer, shifted into drive, and accelerated directly toward him. The yard was wet, and as Sergeant Auringer tried to scramble out of the way, he slipped and fell. Fortunately, the wet ground also caused the Vibe's tires to spin before the car sped forward, giving Sergeant Auringer enough time to get out of the way as Martin Brown drove right past him.

Martin Brown drove through the yard and trees until he eventually crashed into a ditch. He then fled on foot. Other officers pursued and captured him after a short struggle. Sergeant Auringer searched his vehicle and discovered a partially burnt marijuana cigarette on the dash. Martin Brown also told him that there was a methamphetamine pipe in the vehicle, which was discovered in a compartment to the left of the steering wheel. Sergeant Auringer further found a Berretta .380 handgun under the driver's seat. He discovered four additional .380 ammunition rounds on the front passenger seat. The trunk also contained items consistent with yard work including: a weed-eater, gas can, and an ice chest.

After obtaining consent from the occupant of the home, the shed was searched. Inside, the officers discovered approximately thirty grams of a crystal substance that was later determined to be rock salt. Sergeant Auringer testified that in his experience rock salt is commonly used to cut methamphetamine. However, he also noted that rock salt has numerous non-criminal uses, such

as making ice cream or anti-icing roads. Clear plastic baggies and scales were also discovered in the shed, along with a .22 revolver. Along with these items, lawn work equipment was also found, including a leaf blower.

Mason Brown, the original person to flee, was apprehended as well. In a bag discovered near him under the carport, the officers recovered a large amount of illegal drugs, a firearm, and a scale. Mason Brown initially denied ownership of the bag, but later confessed that the drugs, paraphernalia, and gun were all his.

Sergeant Auringer interviewed Martin Brown. Martin Brown admitted to smoking methamphetamine moments before the narcotics officers arrived at the property. Sergeant Auringer accused Martin Brown of trying to run him over, which Martin Brown denied. Instead, he claimed, "I wasn't trying to hit you. I was just trying to get away." Martin Brown also explained to Sergeant Auringer that he had been recently doing yard work. Martin Brown was not charged with any drug possession or trafficking offense.

## II. RECKLESS FLIGHT ENHANCEMENT

The government proposed a two-level sentencing enhancement to Brown's sentence based on U.S.S.G. § 3C1.2. This guideline states: "If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels." *Id.* The guideline comments note that "recklessness" is defined in the commentary to U.S.S.G. § 2A1.4. U.S.S.G. § 3C1.2 Comment 2. In turn, U.S.S.G. § 2A1.4 Comment 1 defines recklessness as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk

constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." Interpreting this guideline, the Fifth Circuit explains that:

> In order to establish that the defendant's sentence should be enhanced under § 3C1.2, the government must show that the defendant (1) recklessly, (2) created a substantial risk of death or serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer, (5) and that this conduct occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

*United States v. Lackey*, 617 F. App'x 310, 312 (5th Cir. 2015) (quoting *United States v. Southerland*, 405 F.3d 263, 268 (5th Cir. 2005)). "[A] substantial risk requires a strong probability that the event . . . will occur." *Id.* (emphasis omitted) (quoting *Rodriguez v. Holder*, 705 F.3d 207, 213 (5th Cir. 2013)).

Brown claims that the enhancement does not apply to him because he did not know it was a law enforcement officer who was attempting to detain him. Instead, he argues, he believed that he was fleeing from unknown armed assailants. This argument is not entirely novel. In *United States v. Hayes*, 49 F.3d 178, 183-84 (6th Cir. 1995), the Sixth Circuit held that "a § 3C1.2 enhancement is inapplicable if the defendant did not know it was a law enforcement officer from whom he was fleeing." There, an unmarked police van attempted to block the defendant's vehicle, and the defendant swerved around and struck the leg of a detective who had jumped out of the van. *Id.* at 180. The district court specifically did not find whether the defendant actually knew that he was fleeing from law enforcement, so the circuit court remanded the case for that finding to be made. *Id.* 183-84.

The Fifth Circuit encountered the *Hayes* misidentification argument in *United States v. Brown Okolo*, 82 F. App'x 131 (5th Cir. 2003). There, the defendant claimed that he did not know that he was fleeing from law enforcement officers when he led them in a car chase. *Id.* at 137.

5

Indeed, the officers drove unmarked vehicles. *Id*. But the Fifth Circuit found that it did not have to "adopt nor reject *Hayes* because we review a district court's factual findings for clear error, and three facts foreclose Okolo's argument." *Id*. First, the law enforcement agents who originally surrounded the defendant's vehicle were wearing jackets identifying them as agents. *Id*. Second, when he began to flee, they shouted "Police! Stop! Freeze!" *Id*. Finally, as he drove away, the defendant yelled to the confidential informant, "You set me up!" *Id*. Thus, it was not clear error for the district court to apply the enhancement. *Id*. at 138.

Other courts have analyzed whether the government proved that the defendant knowingly fled from law enforcement. In *United States v. Sykes*, 4 F.3d 697, 700 (8th Cir. 1993), the Eighth Circuit found the district court did not clearly err when it applied the enhancement even though the defendant claimed that he thought he was fleeing from unidentified armed individuals meaning to harm him. The court determined the enhancement was properly applied under the evidence where an officer testified that the officers identified themselves as police officers at the scene and had a "red rotating beacon" on the dash of their car. *Id*.

In *United States v. Buckley*, 68 F. Supp. 2d 1194, 1196 (D. Kan. 1999), *aff'd*, 216 F.3d 1088 (10th Cir. 2000), a plain-clothes officer in an unmarked vehicle saw the defendant traveling at high rates of speed in a residential area and began to follow him. The defendant made several turns to elude the officer, but the officer found his car in a parking lot. *Id*. The officer got out, produced a weapon, and identified himself. *Id*. The defendant drove his car directly at the officer at a high rate of speed as the officer continued to identify himself and command the defendant to stop. *Id*. The defendant only stopped ten feet from the officer when the officer fired a shot. *Id*. The court found that the defendant knew he was charging a police officer. First, "[h]is efforts to elude the car

6

following him lead the court to believe that he knew the other car contained a law enforcement officer." *Id*. But "[i]n any event, . . . the evidence demonstrate[d] clearly that the defendant knew who was pursuing him when he was confronted by [the deputy]" because of the deputy's repeated self-identifications. *Id*. The court also found that the defendant's attempt to run down the officer was reckless behavior sufficient for the enhancement. *Id*.

Based on this body of caselaw, it is clear that the government presented enough evidence to prove that Brown knew that he was fleeing from law enforcement officers rather than random armed trespassers. While Sergeant Auringer and the other narcotics officers drove unmarked vehicles, their blue lights were activated and flashing when they pulled onto the property—much like the rotating red beacon in *Sykes*. Sergeant Auringer loudly identified himself as a police officer multiple times, as did the officers in *Buckley* and *Brown Okolo*. And Sergeant Auringer wore a tactical vest identifying him as a narcotics officer. Sergeant Auringer did testify that the word "Narcotics" on his vest may have been covered by his arms as he aimed his firearm directly in front of him. However, even without the vest, the flashing blue lights on Sergeant Auringer's vehicle, combined with his repeated self-identifications as a police officer were sufficient to put Brown on notice that duly authorized law enforcement agents were attempting to stop him.

Moreover, driving straight toward Sergeant Auringer, forcing him to dive out of the way, was undoubtedly "a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4. cmt. 1. The Fifth Circuit has found recklessness in relation to this sentencing enhancement for conduct such as: leading police on an eight-mile chase through a downtown area, *United States v. Delgado*, 302 F. App'x 256, 257 (5th Cir. 2008); leading officers in a high-speed chase on the highway in a truck with nine people inside before

7

entering a residential neighborhood and "making two turns in rapid succession at a high rate of speed and running a stop sign," *United States v. Nino*, 482 F. App'x 920, 921–22 (5th Cir. 2012); throwing a loaded gun behind a bar where people were standing, *United States v. Bardell*, 294 F. App'x 881, 881 (5th Cir. 2008); and throwing a bag of methamphetamine onto a sidewalk while police were chasing the defendant (because a child could have picked it up and ingested it), *United States v. Villanueva*, 69 F. App'x 657, 657 (5th Cir. 2003). Even if Brown claims that he did not intend to hit Sergeant Auringer and was merely trying to escape, driving at a high rate of speed in Sergeant Auringer's direction after making eye contact with him created a substantial risk of Sergeant Auringer's death or bodily injury. Brown grossly deviated from the reasonable standard of care in his flight attempt. Thus, the two-level sentencing enhancement is appropriate. Brown's objection to this enhancement is overruled.

### III. POSSESSING A FIREARM IN CONNECTION WITH ANOTHER FELONY OFFENSE ENHANCEMENT

The government also proposes a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B). This guideline states that if a defendant "used or possessed any firearm or ammunition in connection with another felony offense. . . , increase by 4 levels." *Id.* Expounding on the text of this guideline, the Fifth Circuit has explained:

> Application of the enhancement depends on the type of felony alleged. If the crime is a drug trafficking offense, the adjustment automatically applies if a firearm is found "in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." *United States v. Jeffries*, 587 F.3d 690, 692 (5th Cir. 2009); U.S.S.G. § 2K2.1 cmt. n.14(B)(ii). For all other felonies except burglary, the enhancement applies if the gun facilitated, or had the potential to facilitate, another felony offense. *Jeffries*, 587 F.3d at 692; U.S.S.G. § 2K2.1 cmt. n.14(A). The evaluation of the connection between the gun and the additional felony is a factual finding that we review for clear error. *See United States v. Coleman*, 609 F.3d 699, 708 (5th Cir. 2010).

8

*United States v. Brown*, 797 F. App'x 854, 858 (5th Cir. 2020). "Another felony offense" means any federal, state, or local crime that is punishable by a prison term of more than one year, even if the defendant was never charged or convicted. *Id.* Brown objects to the application of this sentencing enhancement, arguing that the government has not proven that he was involved in drug trafficking.

As seen, a finding of an underlying drug trafficking felony is not required to trigger this enhancement. However, if the underlying crime is simple drug possession, rather than drug trafficking, then some evidence must be shown that the gun facilitated, or had the potential to facilitate, the drug possession—such as by "emboldening" the defendant to engage in the crime or by protecting his drug stash. *Jeffries*, 587 F.3d at 694. Evidence of mere simultaneous possession of a gun and illegal drugs alone are insufficient to prove that the gun facilitated the possession. *United States v. Ledesma*, 750 F. App'x 344, 348 (5th Cir. 2018). The government's testimony at the sentencing hearing did not provide any evidence that Brown's gun facilitated his possession of the marijuana cigarette or the methamphetamine pipe. Rather, the evidence presented simply showed that these items were located in the same vehicle as his firearm. *See Jeffries*, 587 F.3d at 691-95 (reversing a district court's application of the U.S.S.G. § 2K2.1(b)(6)(B) enhancement when the evidence only showed that a gun and a single rock of crack cocaine were found in the same vehicle, and no evidence was presented that the gun emboldened the defendant to possess the cocaine or served to protect the small amount of drugs). Moreover, simple possession of both of these items are treated as misdemeanors, not felonies, under Mississippi law. MISS. CODE. § 41-29-139(c)(2)(A) (possession of less than thirty grams of marijuana a misdemeanor); *id.*(d) (possession of drug paraphernalia with intent to use to ingest a controlled substance a

misdemeanor). As a result of all of the above, in order for the sentencing enhancement to apply, the Court must find that the government proved that the underlying crime was drug trafficking—in which case simultaneous possession of a firearm alone is sufficient. *Jeffries*, 587 F.3d at 692.

"A drug-trafficking offense means an offense under federal, state, or local law that prohibits the possession of a controlled substance with intent to distribute." *United States v. Bass*, 966 F.3d 729, 742 (5th Cir. 2021). The Fifth Circuit has considered whether a district court has been presented with enough evidence of a drug trafficking offense for the purposes of the sentencing enhancement on several occasions. It vacated a defendant's sentence after finding that the district court had not been presented with sufficient evidence to prove drug trafficking in *United States v. Sealy*, 661 F. App'x 278, 282 (5th Cir. 2016). There, an informant made a controlled drug buy at a certain house, where he purchased drugs from two individuals. *Id.* at 279. The next day, officers executed a search warrant based on this information and discovered four people in the home, including Sealy, who was located in the living room. *Id.* In the living room was pistol and 2.16 ounces of marijuana within Sealy's reach. *Id.* The officers also discovered:

> a Ruger .44–caliber revolver and 26.23 ounces of marijuana in a shoebox in the southeast bedroom; . . . a Hi-Point .380–caliber pistol and 6.35 ounces of marijuana in the kitchen; . . . a Norinco SKS semiautomatic rifle with two high-capacity magazines in a hallway closet; and . . . $1,668.00 on [another defendant's] person and in the southeast bedroom.

*Id.* Sealy objected to the district court's finding that he possessed the pistol in connection with marijuana trafficking. *Id.* at 280. The Fifth Circuit agreed. "Other than Sealy's mere presence in the house, there were no indications that Sealy was a drug trafficker." *Id.* at 282. The court noted that except for a misdemeanor amount of marijuana discovered near Sealy, all of the other drugs and cash in the house were found in other rooms or on another defendant's person. *Id.*

On the other hand, the Fifth Circuit has elucidated what evidence suffices to support a finding of drug trafficking in connection with a firearm in several cases. In *United States v. Brown*, 797 F. App'x 854, 859 (5th Cir. 2020), the defendant was arrested in his home after a loaded firearm, a plastic bag containing twelve smaller bags filled with 5.1 total grams of cocaine, a digital scale, roughly one gram of heroin, and less than one gram of methamphetamine where all found. The defendant argued that the § 2K2.1(b)(6)(B) adjustment was improperly applied because the evidence at most showed that he simultaneously possessed a firearm and drugs for personal use, not for drug trafficking. *Id.* However, on plain error review, the Fifth Circuit affirmed the enhancement, finding that the baggies, scale, and quantities of drugs divided into small bags found in his small home and in close proximity to the gun supported a finding of drug trafficking. *Id.* at 559.

Drug trafficking was also found in *United States v. Jernigan*, 745 F. App'x 238, 239 (5th Cir. 2018) when the defendant was arrested with a "revolver, 22.4 grams of heroin, synthetic marijuana (K-2), several plastic bags, and a bottle labeled Mannitol, a known cutting agent used in the manufacture and delivery of narcotics." The court also noted the defendant's previous conviction for drug distribution and his admittance to dealing drugs in the past. *Id.* Likewise, in *United States v. Hunter*, 543 F. App'x 374, 375 (5th Cir. 2013), officers arrested the defendant in his girlfriend's apartment and discovered a pistol, .3 grams of cocaine, and digital scales. His girlfriend told police that the drugs were his, and that she would set up drug deals for him. *Id.* The Fifth Circuit found that based on this evidence, "[t]he district court's finding that Hunter's firearm possession occurred in connection with drug trafficking was plausible." *Id.*

The Fifth Circuit has also made plain that drugs do not actually have to be found near the defendant to support a finding that he possessed his firearm to facilitate drug trafficking. *United States v. Zubia*, 727 F. App'x 86, 87 (5th Cir. 2018). In *Zubia,* the defendant was discovered to possess a firearm, but a search of his car did not reveal any drugs. *Id*. However, the search did reveal "a glass methamphetamine pipe, two guns, and a digital scale—all in the vehicle's center console—with a box of plastic baggies used in the repackaging of narcotics found on the floor board of the back seat." *Id.* Furthermore, the search was predicated on a confidential informant observing the defendant a day prior in possession of methamphetamine and carrying a gun in his waistband. *Id.* The court found that "[t]he plastic baggies, digital scale, and his possession of methamphetamine and a firearm the day prior allowed the district court to reasonably infer that Zubia was engaged in a drug trafficking offense." *Id.*

The facts of the case at hand are more similar to *Sealy* than the cases where the Fifth Circuit has found adequate evidence of drug trafficking. In all the cases where the Fifth Circuit has found that the evidence supported drug trafficking, the defendant either personally possessed large amounts of drugs or drug-selling paraphernalia, or eye witness evidence of the defendant's drug trafficking existed. Here, however, Martin Brown possessed a cigarette and a pipe in his vehicle. And Martin Brown's nephew, Mason Brown, claimed responsibility for all of the other drugs located on the property. Thus, like the defendant in *Sealy*, the government can only positively connect Martin Brown to a user amount of drugs. Martin Brown's mere presence near the shed and carport does not support an inference of drug trafficking. It also bears repeating that Martin Brown was never charged with a drug offense in connection to the events of November 10, 2020.

The government points to Martin Brown's proximity to the shed, where evidence of drug dealing was found. However, it is undisputed that Brown did not own the home or the shed—instead the property was owned by a family member. Further, according to the testimony at the sentencing hearing, Martin Brown also worked in lawncare and engaged in lawncare in the immediate area. Lawncare supplies were in his car and in the shed. Martin Brown was plausibly loading or unloading his yardwork equipment. Moreover, a photograph of the scene admitted into evidence at the hearing [40] shows the limbs littering the area in the aftermath of Hurricane Zeta. Landscaping, whether at his family's property or at a customer's, would likely have been in high demand, further adding credence to Brown's engaging in lawncare. And likewise, the government has not presented any reason not to believe that the drug trafficking paraphernalia located in the shed did not belong solely to Mason Brown, who was also nearby and confessed to possessing a trafficking quantity of drugs and scales.

Sergeant Auringer claimed that he had received several complaints that Martin Brown was involved in narcotics activity. Yet he admitted that these tips were not sufficient to create probable cause for a warrant—much less prove trafficking by a preponderance of the evidence. Finally, Martin Brown does have a previous conviction from 2016 for transferring less than two grams of methamphetamine and less than two grams of cocaine, and the Fifth Circuit did take a similar history into account in *Jernigan*. However, his previous conviction—when compared to the other lack of evidence of drug trafficking—is not sufficient to meet the government's burden of proof.

Thus, the government has failed to prove that Brown possessed his firearm in connection with another felony. Instead, the government has proven only that he possessed the firearm near a misdemeanor amount of marijuana and paraphernalia. Because the government has not met its

burden of proof, a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) should not be applied. Martin Brown's objection to this enhancement is sustained.

## IV. CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED, for the reasons discussed, that Brown's objection to the application of the two-level enhancement under U.S.S.G. § 3C1.2 is OVERRULED.

IT IS FURTHER ORDERED AND ADJUDGED that Brown's objection to the application of the four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) is SUSTAINED.

THIS, the 16th day of November, 2021.

                                          TAYLOR B. McNEEL
                                          UNITED STATES DISTRICT JUDGE